Case number 243894, Brandi Booth v. Jonathan Lazzara, et al. Oral argument not to exceed 15 minutes per side, with 15 minutes for the plaintiff and 15 minutes to be shared by the defendants. Mr. Kircher, you may proceed for the appellant. May it please the court. My name is Conrad Kircher. I represent Brandi Booth, who is the administrator of the estate of Dustin Booth. And I would like to reserve three minutes of my time for rebuttal, please. A couple quick pronunciations to avoid confusion. One of the officers who sued here is Officer Fred Doofman. It's spelled as if you would say Dohman or Dockman or something like that. He pronounces it Doofman. Second, the driver of the vehicle during the deadly stop in which Dustin was riding is Justin Dew, D-U-H. He pronounces it Dew as if it were D-E-W. Thank you. Let me make two admissions here at the start because this is a very sympathetic case for both sides. It's sympathetic for my client who was simply trying to get her husband some help and now lives with the guilt of having called the police. And it's sympathetic for the police who were trying to get Dustin help but failed tragically. So the two admissions are, number one, yes, my client wanted the police to take Dustin into custody to get him to the hospital. And that was because she believed he was a danger to himself and others. No, Your Honor. She knew he needed help. He was not a danger to anyone in the home. He loved his children. He loved his wife. He was just out of it. Yes, Your Honor, she did call the police on February 11th in the afternoon, and she used that term. And here's why. Okay, well, let's not quibble about whether she admitted or not. She at least said to the police. She did say that. Okay, that's all I was saying. All right, second admission is no, we do not believe that any of the police officers had any animus towards Dustin. There are no evil actors here. We believe there was tragic poor judgment and incompetence, but no one was out to get Dustin. My client trusted the police to know how and when to get Dustin to the hospital, and they didn't. Now, having made those admissions, let me say that they don't matter to any of these causes of action because there is no subjective valuation or analysis of the police conduct in this case. It's objective analysis. Let me try to focus in on this simply by seeing if we can cabin where you think the incorrect actions or omissions occurred. Is there a challenge to the police deciding that they don't want to storm the house when he's in the house and comes with a gun on his hip and to come up with a ruse to get him out of the house? Was that okay? It was okay until the end, Your Honor. Yeah, I'm segmenting this for a second, even though we'll put it all together. But the ruse to get out of the house. So we get to the end. At least the record seems to show after having been tackled, he gets up, and he has a gun in his hand, and he points it at the officers, so they shoot him. Is it at least the ultimate act here? Is that in dispute? Not in dispute. So it's all the question of whether they should have done things differently after he leaves the house in the car or the truck with due and ends up being tackled on the sidewalk. That's fair, Your Honor. And what originated that was the planning back at the station before Dustin left the house. That's where the failure to accommodate the disabilities originated. Well, you don't tell us what accommodation should have been granted. I think I do in the brief, Your Honor. Call off the stop, number one. So they shouldn't have stopped him at all? They should have just let him drive away under the condition he was in with a gun in his car? Yes. Well, when was the request for an accommodation made? If you're going to make an accommodation claim, doesn't there have to have been a request for a specific accommodation? Not under Title II, Your Honor. There explicitly does not need to be a request for an accommodation. It doesn't happen in these cases. Would we be setting new law in our circuit if we adopted that rule? No, that's in the statute. I shouldn't say it's in the statute. It's undisputed that there does not have to be a request for accommodation under Title II. It's usually the case in other contexts that you have to have it. Absolutely. Title VII or whatever. Probably Title I even for employment. I'm not familiar with that one. Absolutely. In those other cases, there does. There does not need to be in this scenario. I really struggle with how Title II relates to arrests. The first thing I always go to when I have a statutory case is the statute itself. It's not clear to me where an arrest would fall within the language of the statute. It says, No qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity or be subject to discrimination by any such entity. Is there a theory under this language that you're relying on? If I segment it, is it? I think it's strange to say somebody who's arrested was excluded from the participation and the benefits of the services or programs of an activity. I also deny the benefits of that services or programs. Is your analysis that arrests could be covered as being subject to discrimination by any such entity? Your Honor, I would direct you to the Rasmus case, a district court case out of Michigan, which says there are two types of cases here relating to arrests. The second one is what we are pursuing. I know the case law, to be honest. I find it quite frustrating because I find it entirely conclusory. The case law says there's intentional discrimination claims and there's a failure to accommodate claims. I guess the question I have is how does this fit within the text of the statute? This is a de novo or this is a fresh question for us. We have Ruelle, which assumed it, but we don't have any precedent. As I said, the first place I always go to in a statutory case is this text. It's not obvious to me why arrests should even fall within this provision. Again, using the Rasmus language, this is what happened. The police failed to reasonably accommodate Dustin's disability in arresting him, causing him to suffer more harm than a non-disabled person. In other words, they created a scenario that was contrary to all their policies about de-escalation. They created a scenario where they were going to storm him, and non-disabled, non-mentally ill people would have probably reacted differently than Dustin did. But Dustin acted in a way, which is entirely predictable, that caused the tragic outcome. But you seem to be saying that the failure to accommodate was because they arrested him. Failure? No. You said earlier, once he left the house, which was okay, they should not have arrested him. Under the circumstances. So, Judge, Sergeant Myers knew. Under these circumstances. Yeah. Once he gets in a car with due, in a gun, and he drives away, you're saying it's a failure to accommodate because they took action, because they arrested him. No, Your Honor, I'm not saying that. Okay. What are you saying? Okay. First of all, Sergeant Myers and Captain Curliss both knew this was a bad idea. Captain Curliss had been there all afternoon, and he said the reason we didn't go to his door is if he had a gun and wanted to use it, we were going to have a shootout, which is exactly what happened that night. Sergeant Myers, who'd been with him all day, and who knew him from the community, their sons were friends, when he learned that Dustin was leaving the house with a gun, he called Lieutenant Rosenbaum and he said, call off the stop, because we're going to have a shootout or a hostage situation. Rosenbaum said, go ahead and do it. So, what I'm challenging, Your Honor, first of all, there are two things. I'm challenging the planning, and I'm challenging the execution. The planning was, they knew Dustin had been in a mental hospital, well, had been in the behavioral health ward of Atrium Hospital. They knew he was a gun owner, that he had guns, and on that particular incident, they knew he had a gun. They knew they'd been out there two days before for another mental health call. They knew all these things about him, yet they failed. In my brief, I list all these beautiful policies that Monroe has. Don't use lights and sirens. Don't use loud voices. None of that was planned. In fact, what they planned was, we're going to scare the heck out of him with a dog. We're going to go maximum force. We're going to jump out of our cars with guns pointed at him. We're going to shout vulgar, inconsistent commands. Get up, get down, put your hands up, come here, go there. And all these things, and we're going to overwhelm him. So, I'm also confused by, so you claim that the officers themselves should have just followed the policies, the local entity's governmental policies. But an ADA claim, I think the defendant for an ADA claim is only the entity and not the individual officers. Is that true? Who are you actually suing under the ADA as compared to your 1983 claims? The city of Monroe under ADA, a direct claim. So why, so in the 1983 context, we have clear case law that says cities can't be liable vicariously liable for the conduct of their employees. You have to show a policy that was problematic. But your ADA theory seems to me to be that their policies were just fine, but that the officers themselves failed to follow the city's own policies. So it's not obvious to me why the city should be held liable for that. Okay, I understand your question. Very good question. So, first of all, this statute permits an entity, well, it requires the entity reasonably accommodate. So that's the difference between this and 1983, like Monell. But you would concede that the entity did reasonably accommodate, at least as a general matter, because it had policies. And the problem is that the officers themselves ignored those policies. I concede that they had beautiful written policies. The difference is all of the officers who testified in this case said that's not what we do. What we do is we treat this the same as any other stop. And they said this was treated the same as any other stop. So all these policies are great, but they do nothing. So is it a failure to train claim then, I guess? Analogous to failure to train. I'm curious, do you think that the – I just don't know the law. It wasn't briefed particularly on this issue. Do you think that the Monell type analysis extends to the ADA? By which I mean, you know, failure to train, other types of – No, and again, because this is a direct claim against the city. Unless there are other questions, I'll reserve the remainder of my time. Okay, thank you. You'll have your full rebuttal. Thank you. Thank you, Your Honors. My name is Dawn Frick. I represent the city, Chief Buchanan, Mike Rosenbaum, Brian Curliss, and Drew Osbacher. Just to – since my time is short, I will address a couple of things that you mentioned there. We would argue that it is – the ADA claim is problematic for a number of reasons that you touched upon. One, because of the fact that this – the Sixth Circuit, this court, has determined that there isn't a vicarious liability claim against the city under Title II of the ADA in Jones v. the city of Detroit. And while you can call it a claim against the city, as Your Honor has noted, what's really being looked at here is the actions of the officers, which is a quintessential vicarious liability claim. So we would argue that because of that, Title II of the ADA doesn't even apply. But even if you were to look beyond that and look at the issue of whether it applies to an arrest, I would agree with you, Your Honor, that when you look at the language of the statute, it's difficult to determine how an arrest itself would fall under the statute, whether it's an aid, benefit, or service. What about be subject to discrimination on the basis of a disability? You could arguably say mental health arrests, although sanctioned by the Fourth Amendment, maybe are regulated by the statute. So if you – I think our case law in the Fourth Amendment makes quite clear that if somebody, because of a mental impairment, is a danger to himself or others, that that's a basis for an arrest. But arguably that would be discrimination on the basis of the mental impairment because the mental impairment is what is causing the seizure. So do you, I guess, have a response to why the or be subjected to discrimination might not cover the situation? Well, I think, Your Honor, it becomes difficult in this situation because you have to take a look at everything. So when the courts have looked at Title II and its applicability to arrests and in the context of a mental health arrest, you still have to determine whether it's reasonable. And you still have to determine whether it's reasonable in light of the overriding public safety concerns and determine whether that accommodation is reasonable. So, again, in this particular situation, you can't take out and ignore what happened here. And what happened here is while they approached their interaction with Mr. Booth throughout the day, and I think arguably appellant counsel would agree, throughout the day, consistent with it being a mental health issue, getting crisis- Consistent with the city's policies? Because as I understand his argument is that, and I could be misconstruing it, but it sounds to me like he's saying that what the accommodation is is actually to follow the policies that the city has on the books. But in this instance, the city's employees did not actually, they didn't implement that accommodation by actually following those policies. I don't think that's actually accurate, however, though. I think that they did follow the policy up to the point when he left the house armed with an individual. And at that point, they had to pivot somewhat. And their policy itself says that individuals with mental health crisis may still present a serious threat to officers, and such a threat should be addressed with reasonable tactics, and nothing in this policy shall be construed to limit an officer's authority to use reasonable force when interacting with a person in crisis. So- What about the theory that they did seem to do a de-escalation, but then they seemed to flip? So it was de-escalation at the home, but then the theory once he was in the car seemed to be a theory of aggressive escalation, and like an aggressive show of force to hope to get him to comply rather than other types of de-escalation techniques. Like the dog was the reason for the dog, I guess, under the theory it was just a show of force type of- I think it's important to sort of look at it in the perspective of the timeline of things, however, because throughout the day when they did pull back and de-escalate, they were still continuing to watch. There was conversation between all of the individuals involved, the police, and as well there was actually conversation with his wife that ultimately the goal was if he left the house to stop him so that they could detain him and take him to the hospital. That was the ultimate goal. That's the whole point. I mean, as I understand the argument of Mr. Kircher, it's they were doing okay until they formulated this plan to let him drive away with his buddy with the gun in the car. And the plan at that point seems to have been this shock and awe takedown of him in the car as opposed to barricading himself in the house. So that's the first part of it. Is it a violation of his rights under either 1983 or the ADA to have determined this- I'm just calling it, for lack of a better word- a shock and awe takedown when he leaves the house? Does that violate his rights? I would say under 1983, absolutely not, because consistently the courts have said if there is a substantial probability of him performing dangerous acts or being a danger to himself and others, that they have the probable cause to make that stop. And what's the basis for that other than the fact that he went back in the house and came out with a gun? Oh, I think there's- Is the gun the determining factor then? That's not the only determining factor, though, Your Honor. I think you have to look at the totality of the situation. Throughout the day he had- But if the policies say don't put your lights on, don't use loud language and all of this kind of stuff, that seems to be the predicate of what they were going to do once they got him out of the house, which seems to be inconsistent with what their guidelines are. Now you can say the guidelines don't count. We shouldn't look at them. But what do we do with that seeming inconsistency between their plan and the guidelines? I think, Your Honor, the plan was not, as you say, a shock and awe. The plan was to approach it as a traffic stop. It became a high-risk traffic stop when it became that he was armed. And it was never the plan to get him out of the house with a gun in his hand. It was never the plan to get him out of the house. The issue was if he left the house, then they would try to stop him to take him to the hospital. I don't see how you can say that. The plan was his buddy showed up and said, I think I can get him to come with me out of the house. The police said, fine, that's the plan. Well, the buddy said he was going in, and then the buddy cooperated and said, I think I can. Because, yes, the plan was if he left the house, then they would be able to stop him. Because he wasn't throughout the day coming out. He was armed throughout the day. He wasn't responding to crisis. He wasn't responding to the police. He made some statements that at least appeared threatening towards the family, at least from the police perspective. So all of those things had to come into play when they ultimately wanted him out so that they could help him. What happened, though, was dictated somewhat by the actions of Mr. Booth himself, and not just an attempt to, you know, shock and awe, as we say. The hope was to get him and get him out. It only rose to the level of a high-risk traffic stop when he chose to be armed when he left the house. Well, obviously, in the end, everything went horribly wrong. Nobody could argue about that. But as far as the traffic stop goes, Mr. Kircher makes a big deal out of either says they shouldn't have stopped him at all or they shouldn't have stopped him the way they did. So did they do anything different here other than having a police car pull behind this pickup with its lights on? I'm sorry, I don't understand the question. Did they do anything different? The actual stop, which led to him grabbing the gun and getting out of the car. I think, did they do anything different than they otherwise would with a non-mentally impaired individual? At that point, not necessarily, because at that point, they knew he was with another individual and he was armed, and they had to approach it. Let me ask you, what did they do? Did they surround him with a bunch of police cars? Did one car come up behind him with its lights on? Did they use their loudspeaker to say pull over? What did they do? They didn't surround him. There was cars that came up behind him with the lights on to stop him. Once they stopped, the police witnessed what they believed to be a struggle within the vehicle, which heightened the situation. And then the driver, Mr. Du, jumps out, runs to the back of the truck and says he's armed. Mr. Kircher says they shouldn't have done what they did when they actually stopped him. And one thing that he says they shouldn't have done is they put the lights on. You're not going to agree that they shouldn't have put the lights on, but you admit they put the lights on. They did. Did they do anything else other than putting the lights on, the truck stops, and then at that point, the decedent decides I'm out of here, gets in a tussle, grabs a gun, and get out of the car. Did the police do anything to precipitate that action aside from pulling him over with their lights on? No, because he jumped out of the car on his own involuntarily and began to head towards the intersection. But at that point, they hadn't yelled at him. They hadn't used a loudspeaker. Cars weren't coming in from everywhere. Nobody was pointing a gun at him. I'm just making this up, but am I right about that? Nobody was pointing a gun at that point. There were cars everywhere. Once he got out on his own. Did a police officer even get up to the car before he chose to grab the gun and get out? No. That's all I'm trying to figure out. I'm trying to get you to admit it. No, they didn't get up to the car because he jumped out before that. All they did, stop pushing back unless I'm wrong, all they did was pull up behind the car with their lights on, which is a universal signal, I'm stopping you, pull over. That's all the police did. Yes, Your Honors, that's what they did. Just say yes if that's it. Thank you. Okay. Thank you. We'll hear from your co-counsel. Good afternoon, Your Honors. Essentially, because I'm done with her, all they did was, and this might be bad, I'm not saying it's right or wrong, I'm just trying to figure out what they did. All they did was pull the driver over, not Mr. Booth, they pulled the driver over by utilizing the lights on top of their car. Correct. And then everything went to hell after that. Correct. Then the officers witnessed a struggle, as Ms. Frick was saying, and they witnessed a struggle within the vehicle. The driver of the vehicle, you know, exited in a hurry. There was comments made by an officer, I think, are you stabbed, were you stabbed, and that's when, you know, things obviously escalated. It comes down to, is it a failure to accommodate or a violation of 1983 to employ your lights to pull somebody over under circumstances like this where they have reason to believe there's a mental issue? I mean, Your Honor. That's the case, isn't it? There's additional factors. I mean, mental issue, but there's also the 1983 factors, which were the fact that, you know, whether he was a danger to the public and to himself at that point. I take it your client hasn't been sued under the ADA, right? No. I represent Officer Fred Dufman, and the two claims that are pending against him are the unlawful seizure under 1983 as well as the excessive force claim for the release of the canine and then the ultimate takedown of the suspect. The seizure would be not the use of the firearm. I think that was admitted once he responded with a firearm, but it would be the takedown? The seizure that Mr. Kircher explained, and as I understand it, is the stop. The way that he described it in the briefing was the seizure, the justification for, and the execution of the stop. So, I mean, Officer Dufman was not there for this briefing that he takes issue with during the day. Officer Dufman came on duty after that powwow at the police department had taken place and after they had begun to execute the stop. Officer Dufman was later on the scene. He was the canine officer, and he was called up front once he arrived, but the stop had already taken place when Officer Dufman arrived. Yeah, I was curious. So he didn't engage in the stop, right? He didn't call him. That would be the other officers. I thought it was for him. He's the one who released the dog, number one. But then the dog did not. The dog made no contact. So that perhaps does not qualify as a seizure. So then it would be the takedown. But why was a takedown appropriate at that point? Because he really hadn't. All he was doing was walking away. Why wouldn't that qualify as a type of passive resistance that shouldn't necessarily lead to hands-on response? Because he was doing more than walking away. So at this point, what Officer Dufman witnessed at this point is, one, that he believed there was an assault in the car on Mr. Dew, who was driving the vehicle. There was a comment made by an officer that perhaps there was a stabbing. At this point, there also was commentary that Dustin Booth was armed, that he was carrying a firearm. Then he was disobeying orders from Officer Dufman to stop, to get down, to commence, to stop walking towards the traffic, the open businesses. This was a busy intersection where this all took place. So there was that. He was also, as I said, carrying a firearm. And then the dog missed him. And when he looked back, the dog flew by him and didn't re-engage with Mr. Booth. So at this point, Officer Dufman's looking at the totality of the circumstances. He's aware that there was a standoff earlier in the day. He's aware that Mr. Booth is unstable mentally at this point. He's aware that he's possessing a loaded firearm. He believes that an assault has already occurred or violence has already been committed. And he's walking towards a busy intersection with open businesses. So at this point, I don't think that there was another option other than to stop his progress. The one comment you made in that scenario, which I'm just interested, I think that the record is undisputed that there was a struggle between Mr. Due and the decedent. But there was no stabbing. There was no stabbing. So why should, if an officer yells out, I think the video suggested was like, were you stabbed? But if an officer yells out a misstatement, does that actually go into the reasonable analysis on the use of force? I do think it does, Your Honor. Because even a mistake of law or a mistake of that scenario, you can still have qualified immunity. And that's part of the qualified immunity analysis, which we're kind of, there's two elements here with this, is whether this actually rises the level of excessive force under the constitutional analysis, and then whether Officer Doofman would be entitled to qualified immunity, which we've argued both in our briefing. But I'm just talking about when a statement from another officer that turns out to be false. I suppose what if the officer yelled out he had a gun and he didn't actually have a gun? You think that that could provide a basis if the individual officer who later shoots doesn't see a gun? I think that that's a question. I mean, I think that what you look at is whether it was reasonable, right? I think there's some case law out there that like, you know, there was a misapprehension that a gun was in the hand and it might have been a peeper or a beeper or something like that. And the courts look at whether it was reasonable. I mean, those tend to be more jury decisions at the end of the day with those. But in that case, you know, they think they looked at whether it was reasonable to believe it was a gun. And in this case, he saw a struggle. He knew he was armed. I think it was reasonable under those circumstances and under qualified immunity analysis to believe that that statement, you know, could have accurately described what was going on within the vehicle. Well, you're relying upon everything that your client knew up to that point. Correct. And interestingly enough, that seems to be what the Supreme Court is telling us in this most recent case to look at. It's not a segmented approach. Correct. You look at the entirety of the circumstances. So he knew what had happened before. He knew that he had a gun. Ignore the stabbing. They yelled out, he's got a gun. Right. Your guy's trying to stop him and he refuses to stop. So that's basically the basis you're relying upon to suggest there was no constitutional violation. Correct, Your Honor. And also, you know, Officer Doofman, being the canine officer, has a cruiser that he takes home. So he was aware from radio traffic that there was a standoff earlier in the day where, you know, Mr. Booth was armed and was exhibiting erratic behavior. And so he had the full picture of what was going on and how dangerous the scenario could be with Mr. Booth's mental state and the fact that he was carrying a loaded firearm. Would he have been justified in sending the dog after Mr. Booth and then when the dog was unable to bite him to do a physical takedown? Would he have been authorized to do that, in your estimation, but for all of these other facts relating to the mental issue here? But for the other facts? I mean, if they didn't have all of the escalating factors? He's driving by, he sees one of his police officers stop somebody, the guy gets out and he walks away. Would your officer have been entitled to yell stop and to send a dog and do a takedown if he refused to stop? Well, there's the law out there. I think Robinette V. Barnes says that the use of a canine is not, there's no serious threat of bodily harm or serious injury with that. You have to have a basis to send the dog after someone. You have to have a basis and there has to be a reasonable apprehension that harm can result here. But for everything that had happened up to that point, including the question of his mental condition, absent that, would he have been entitled to send the dog and take him down? I don't know that under those circumstances, if you weren't aware that he was armed, if you weren't aware that there was danger involved, and if he wasn't disobeying police commands, maybe a canine release would not have been appropriate under those circumstances. Okay. Thank you very much. Thank you, Counselor. We'll hear a rebuttal. Thank you. Let me take a moment just to give an overview of the three causes of action because I want to make sure there's no confusion here. So we have a cause of action under the ADA, which says that during the planning process of this stop, the city of Monroe failed to accommodate Dustin's disabilities, which led to an inevitable confrontation and the result. The second cause of action is, Judge McKee, I think you were touching on this, is the stop itself. Was there a Fourth Amendment search and seizure justification for that? I'm just going to touch briefly on this because I want to go to the excessive force issue. There's inconsistency in the defense position on whether they stopped him because he was a criminal, he had committed two crimes earlier in the day, littering and failure to comply, or were they stopping him for the wellness issue, for the involuntary commitment. First of all, he didn't fail to comply earlier in the day. If you watch that video, the video does not support the defense position that he was ever commanded to stop. Dustin just goes right by. Did their subjective intent even matter though under a Fourth Amendment claim? As long as one of those bases objectively existed, isn't that enough? It doesn't matter what they subjectively thought. Correct. What I'm saying is, objectively, there was no failure to comply. There's no claim here that they pulled him over after he left the house because he had littered earlier. They don't say that. They do. Officer Asbacher, Captain Kurles was the one who instructed Asbacher back at the briefing to write him up for failure to comply and littering. Asbacher first testified that he wrote him up for littering. Yes, one of their positions is that they pulled him over because he had committed these crimes. My point was, okay, assume we agree with you that that's inadequate and that was the reason. If they also had this alternative reason that it was objectively reasonable because of the danger to himself or others to pull over the car, that would be sufficient. This case really just comes down to whether they had an objectively reasonable basis to conclude that. I agree with you halfway. I don't think he was a danger to anyone, but I agree they may have had another reason, and that is the mental health concern, that they needed to get him to the hospital. Everybody wanted to get him to the hospital. But then that undermines the next cause of action, and that is the use of force. Because if they were pulling him over because he was mentally ill, there's no justification for force. Judge Murphy, now I'm getting to the third cause of action, Doofman's excessive force. You touched on it. There was only passive resistance. Please watch the videos of the stop. The cases seem to be very clear to say that when you're dealing with somebody that's suspected of having a mental illness, the permissible police actions are substantially different, whether the person is or is not armed. Do you agree at least with that generalization? I think so. And this is a case where the person was armed. So it seems to me that many of the cases that you're citing don't deal with a person who's mentally ill and armed. So if I'm right about that, they don't really help us one way or the other. Well, but that's more justification to back off. Don't confront him. That's not what the mental health issues, the policies say. You don't confront that person. You back off. What do you do? You just let him? He was on his way to his sister's house on a Friday night to go watch a movie or something. He had been at his house all day. Everyone agrees he wasn't a danger to anybody in his house. He was being transported to his sister's house. Let him go to his sister's house. Let him chill out. He hadn't slept in days. He's going to transfer the arguable standoff that was at his own house, where his wife and kids are present, to his sister's house. How could that be a police obligation? I'm missing that. He passes out at his sister's house. Then they come in, they take him to the hospital. Two days before, he had talked. That's your theory. They should have let him go because he might have passed out, and then they could have taken custody of him in a less intrusive fashion. That's what the policies say, yes, Judge. Okay. All right, thank you very much. Thank you. This is an important case. Everybody can agree it's a tragic case. We thank you for your arguments today, and we'll take the case under submission.